STOVALL, CHARLES M.
mike@mikestovall.com
601 N. KIRBY ST. #527
HEMET, CA 92545
760-518-5225
IN PRO SE
NO FAX





UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CV 11 09192 GHK (FmOx)**

UNITED STATES, ex rel.
CHARLES M. STOVALL et al.,

      Plaintiff,

  vs.

MCCROMETER, INC.,
DANAHER INC.,

AND DOES 1 THROUGH 10,
INCLUSIVE,

      Defendants.

CIVIL ACTION
NO

COMPLAINT FOR VIOLATIONS OF

FEDERAL FALSE CLAIMS ACT,
(31 U.S.C. §§ 3729 et. seq.)

CALIFORNIA FALSE CLAIMS ACT,
(Cal. Gov't Code §§ 12650 et.
seq.)

**FILED** ████████ **AND UNDER SEAL**

**DEMAND FOR JURY TRIAL**

## I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS

1. This is an action to recover damages, civil penalties and
other equitable relief on behalf of

**A.**    United States of America arising from Defendants selling
knowingly defective and fraudulent large water meters to



Federally funded projects and from a scheme[1] to facilitate fraud claims by Defendants' Clients and their employees, agents, and/or their contractors to avoid, conceal, or decrease Defendants' Clients obligation to pay or transmit money to the Government of the United States of America in violation of 31 U.S.C. section 3729, et seq. popularly known as the False Claims Act (the "Act") which provides that the United States District Courts shall have exclusive jurisdiction of action brought under that Act; and

B.      California, for violations of the California False Claims Act, Cal. Govt. Code section 12650 *et seq.,* and in particular sections 12651 (a)(3)(7) and (8); and

C.      Relator, Charles M. Stovall, arising from Defendants threatening, harassing, discharging, or otherwise discriminating against Relator in response to Relator discovery and reporting of the aforesaid false claims and false claims scheme. Relator, acting on behalf of and in the name of the United States for Counts I-IV, acting on behalf of California for Count V, and acting on his own behalf for Counts VI & VII brings this civil action under the *qui tam* provisions, and alleges as follows:

---

[1] Exhibit 1. Published 2/18/2005 ORDER ON SUBJECT MATTER JURISDICTION (31 U.S.C. § 3732(b)) Case No. SA CV 00-1216-GLT [ES]. See first paragraph "The Court holds, on apparent first impression, "the same transaction or occurrence" jurisdiction requirement of the federal False Claims Act (31 U.S.C. § 3732(b)) is broad enough to include a system or scheme of false claims".

## II.   JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this Complaint pursuant to the False Claims Act, 31 U.S.C. 3729 et seq., 28 U.S.C. § 1345 and 31 U.S.C. §§ 3732(a) and 3730(h). The Court has personal jurisdiction over the Defendants because the Defendants reside and/or transact business in Hemet, Riverside County, California. Relator also invokes this Court's ancillary jurisdiction over pendent state claims arising out of the same operant facts.

3. Venue in this District is proper pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732 (a). Section 3732(a) of the Act provides that any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section judicial district. The acts and violations complained of herein occurred in Riverside County, California where Defendants resided and/or transacted business.

4. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (the "Relator") and for the Government and to share in any recovery. Under the Act, this complaint is said to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders. The government may elect to intervene and proceed with the action within sixty (60)

days after it receives both the complaint and the material evidence and information.

5. As required under False Claims Act, 31 U.S.C. Section 3730 (b)(2), Relator shall provide to the Attorney General of the United States and to the United States Attorney for the Central District of California shortly after the filing of this complaint, a statement of all material evidence and information related to the complaint. This disclosure statement supports the existence of false claims by the Defendant.

6. This action is not based upon any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A). The Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based.

7. Relator has voluntarily provided this information to the government prior to filing this Complaint to the extent any of these allegations may have been publicly disclosed within the meaning of 31 U.S.C. § 3730.

8. Based on those provisions, Relator seeks to recover damages and civil penalties arising from Defendants' retaliation against Relator and for the design, manufacturing, and sales to Defendants' clients knowingly defective and "fraud enhanced" large water meters. One such example of Defendants' clients is Eastern Municipal Water District (EMWD) which uses

said meters to implement this court's Federally Adjudicated Water Allocations Rights for both the Soboba[2] and Pechanga[3] Tribal Water Rights Settlements. Federal funds were/and are being used to purchase said meters used by EMWD to monitor[4] these settlements.

9. Relator seeks the court's jurisdiction to rule on the issue of "use of water meters that are defective, fraud enhanced, and not state law compliant being used to enforce Federal court mandated equitable water allocation rights".

10. Plaintiff motions the court to rule that said meters need to conform to state laws, codes, and regulations modeled on national standards when used to enforce Federal rulings regarding water allocation rights.

### III.   PARTIES

11. Qui tam Relator CHARLES M. STOVALL was formerly employed by the Defendant McCrometer as a Senior Embedded Systems Engineer for 15 months and believes he was engaged in a protected activity as defined in the United States False Claims Act, 31 U.S.C. § 3729 et seq. and alleges as follows:

---

[2] Exhibit 2. Public Law 110-2971 which is cited as the "Soboba Band of Luiseño Indians Settlement Act"

[3] Exhibit 3. H.R. 4285 which is cited as the "Pechanga Band of Luiseño Indians Settlement Act" which references United States v. Fallbrook Public Utility District et al., Civ. 19 No. 3:51-CV-01247 (S.D.C.A.)

[4] Exhibit 4. EMWD Document Hemet/San Jacinto Water Management Area 2007 Annual Report, See Figure 23. which shows a McCrometer Meter being read by EMWD Employee for the Extraction Monitoring Program. See table 24 which shows allocations of base production rights which requires equitable metering by the court.

**12.**    Relator further alleges that the employment relationship that gave rise to the allegations set forth herein was entered into in California, and that the subject of said employment relationship was performed in the City of Hemet, County of Riverside.

**13.**    During the course of his employment with Defendants, Relator performed each and every condition and covenant required on his part to be performed pursuant to said employment agreement and in particular was continuously employed by Defendant from on or about March 3, 2008, to on or about May 6, 2009.

**14.**    Defendants Doe 1 through Doe 10, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Relator. When their true names and capacities are ascertained, Relator will amend this complaint by inserting their true names and capacities herein. Relator is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Relator's damages as herein alleged were proximately caused by those Defendants. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers also to all Defendants sued under fictitious names.

**15.**    Each reference in this complaint Relator is informed and believes and alleges on the basis of that information and

belief, that Defendant MCCROMETER, INC. CORPORATION, a Delaware Corporation and their parent corporation DANAHER CORPORATION, a Delaware Corporation, (herein "MCCROMETER") is a corporation doing business in the City of Hemet, County of Riverside, State of California.

16. On Defendant's website they claim to be the "Best selling Irrigation Meter in the U.S." Defendant's website also sites significant utilization for it's mechanical and electronic water meters in potable water, wastewater treatment and management, water well production, marine system testing, fire sprinkler testing, pumping stations, golf course and park management, truck loading and discharge, canal laterals, central pivot systems and leaching for environmental.

17. In addition the Defendant maintains two "Flow Calibration Facilities", one in Hemet, CA and the other in Porterville, CA.

18. Relator is informed and believes and thereon alleges that at all times herein mentioned Defendants, and each of them, were the agents, servants, and employees each of the other, acting within the course and scope of said agency and employment.

19. In 1991 Defendant DANAHER'S two major controlling shareholders, Steven and Mitchell Rales, who now serve as chairman of Danaher's board and chairman of its executive committee, were convicted of Hart-Scott-Rodino Antitrust

Improvements Act of 1976 PREMERGER notification rules and fined more than $850,000 by the U.S. Department of Justice working with the Federal Trade Commission[5]. The Department of Justice working with the FTC only prosecuted 4 of 45 full-phase investigations in 1991 with the Rales brothers being one of the four brought to trial. The infamous Junk Bond King, Michael Milken, was the brothers' financial backer[6] and mentor.

**20.**     Defendant DANAHER boasts they have delivered 25% per year return to shareholders for more than 20 years. To quote an article from Bloomberg Businessweek Magazine[7]

> "But despite its low profile, Danaher is probably the best-run conglomerate in America. It's clearly the best performing: Over 20 years, it has returned a remarkable 25% to shareholders annually, far better than GE (16%), Berkshire Hathaway (21%), or the Standard & Poor's 500-stock index (12%)".

**21.**     On May 4, 2009 Danaher shareholders[8] challenged Danaher/Kerr to phase out Mercury Tooth Fillings since there are no safe amounts of mercury and they are the only company manufacturing these fillings.

---

[5] Exhibit 5. Federal Trade Commission 1991 ANNUAL REPORT See p.4 line 15,16 and p.67 bottom paragraph and top paragraph of p.68.
[6] Exhibit 6. New York Times, September 09,1988 by Michael Quint "MARKET PLACE; Takeover stocks And Drexal Woes". See paragraph 4.
[7] Exhibit 7. February 19,2007 Bloomberg Businessweek "A Dynamo Called Danaher"
[8] Exhibit 8. May 4, 2009 Danaher shareholders Challenge Danaher/Kerr to Phase Out Mercury Tooth Fillings, Dominican Sisters of Hope, Others Question the Continuing Use of Mercury in Fillings, Washington D.C.

## IV.  BACKGROUND INFORMATION AND GENERAL ALLEGATIONS

**22.**    Relator is a former Senior Computer Hardware-Software Engineer that worked for Defendant McCrometer as Technical Lead on three major projects at the time of his constructive termination. McCrometer, Inc. designs, manufactures, calibrates and sells **water, oil, and gas** meters. Danaher, Inc. has owned McCrometer since 1996; in addition to over 60 other flow measurement companies around the world. Both companies sell to government entities and other purchasers nationwide that utilize said meters for fiscal metering.

**23.**    Relator contends since 2004 Defendants have knowingly designed and sold large water meters (Totalizing Flow Meters (TFM)), example Model FC100/101 which is an electronic totalizing flow meter) which have designed-in "fraud features" that allow Defendants' customers to easily manipulate seven factory set calibration parameters[9] leaving no audit trail. This is in violation of state water meter laws since doing so would invalidate the calibration and facilitate fraud.

**24.**    In October 2008 Relator contends that Defendant coerced Relator in violation of Cal. Govt. Code § 12653(d)(2) to add more illegal software code to the FC100/101 to add a "Settable Totalizer" user interface feature that allows Defendants'

---

[9] Exhibit 9. McCrometer Document FC101 Product Record showing factory-set flow measurement calibration values (parameters). The first three columns are changeable in the field thus violating the factory calibration.

clients to enter any value into the "Totalizer" desired. Relator contends that to the casual observer this is the same fraud as "Rolling back the Odometer on a car".

25. Relator contends that since 2000 Defendants and their clients have knowingly conspired to utilize said fraudulent meters on programs funded by both Federal and State government entities and others in violation of Federal and State(s) False Claims Acts.

26. Relator contends that he was in a protected activity under Federal and State laws and as stated on page 1 of Defendant's job description[10] Essential Functions #10, 11 & 15.

"10) Ensures design compliance with applicable standards and codes

11) Ensures reliability of electronic circuits in specified operating environments.

15) Investigates production/quality problems providing short and long term solutions"

27. Relator contends that on May 5 & 6, 2009 he reported fraudulent activities[11],[12] pursuant to learned company policy (DANAHER STANDARDS OF CONDUCT) and that he was terminated in

---

[10] Exhibit 10. McCrometer Document 2/11/2008 EMBEDDED SYSTEMS ENGINEER JOB DESCRIPTION, See "Essential Functions #10,11, & 15" on page 1 of 2.

[11] Exhibit 11. McCrometer HR May 6, 2009 Notarized Voicemail regarding 5/6/2009 meeting Issues on lines 4, 6 & 7.
[12] Exhibit 12. McCrometer Document May 22, 2009 SUBJECT: NOTICE OF POTENTIAL ELEGIBILITY lines 1-3.

retaliation in a constructive termination the next day in substantive violation of public policy per the Federal and State False Claims Acts.

28. Defendant's policy of requiring employees in California to report suspected fraud to management, which is an approved action federally, is not in California. California False Claims Act requires an employee to disclose the alleged fraud to a government or law enforcement agency and to prove that the employer coerced the employee into engaging in the fraudulent activity.

29. Defendant McCrometer admits in writing they do not have any written evidence of Relator's alleged "verbal resignation". See Exhibit 13 first sentence[13]. Relator denies under oath[14] he resigned but instead thought he had been fired in retaliation for;

1) Since Relator had reported fraud to HR the day before,

2) Since Relator's work computer had been seized per company custom upon firing an employee, and

3) Since Relator had told his supervisor, Robert Pinkerton the day before he had been emailing back and forth with an ex-FBI white collar crime investigator regarding fraud issues.

30. Relator continued to tell Defendant McCrometer about fraudulent company practices immediately after his

---

[13] Exhibit 13. McCrometer Document 5/8/2009 SUBJECT: TERMINATION OF EMPLOYMENT

constructive termination[15], see lines 1 & 2 but was told on line 5 that his allegations were not specific enough even after a lengthy meeting in late May 2009.

31.    In September 2010, Relator filed two formal complaints via certified mail with the appropriate California State authorities, California Department of Food and Agriculture, Division of Measurement Standards (DMS) using their complaint form[16],[17]. The only response Relator received was a phone call January 12, 2011 at 12:53 from Gary Castro from DMS. Gary stated that the "Settable Totalizer" was **obvious fraud** but his department did not have jurisdiction and Relator should contact the Department of Water Resources (DWR).

32.    Relator had emails with DMS regarding jurisdiction[18],[19]. Relator has contacted DWR via phone and email but has not received a response.

---

[14] Exhibit 14. Deposition of CHARLES MICHAEL STOVALL 12/10/2009 See page 61 lines 17, 18,19,20,21,22,23 regarding fraud issues.
[15] Exhibit 15. McCrometer Document 5/27/2009 SUBJECT: RESPONSE TO ALLEGED COMPANY FRAUD
[16] Exhibit 16. CDFA/DMS Complaint FC100/101 Dated 8/30/2010.
[17] Exhibit 17. CDFA/DMS Complaint RC50/51 Dated 8/30/2010.

[18] Exhibit 18. 9-28-2010 Email From: Dan Reiswig To: Mike Stovall "I have found your documents sent to this office. DMS will review and inform you of the result as you have requested on the two Complaint Reports received." Complaint filed with the California Department of Agriculture, Division of Measurement Standards.

[19] Exhibit 19. 8-25-2010 Emails From: Bill Tracy, Bill Tracy, Deputy Agricultural Commissioner/Sealer Riverside County RE: Jurisdiction? "Also is another agency such as the CPUC is not doing their job and allowing fraud to occur the DMS might get involved?", "Mike, You're right. It's a lengthy process getting everybody on the same page." "Water is another issue by itself governed by the water code. The CPUC may not have jurisdiction."

**V. DEFENDANT'S BUSINESS IMPOSES A SPECIAL POSITION OF PUBLIC TRUST (U.S.S.G. § 3B1.3)**

33. Defendant manufactures water, oil, and gas fiscal metering devices and systems used for large scale commerce throughout the United States and Canada. In addition Defendant provides calibration services for said fiscal meters requiring periodic service.

34. Defendants are in a SPECIAL POSITION OF PUBLIC TRUST PER U.S.S.G. § 3B1.3 as a manufacturer and as a Calibration Service used for fiscal metering using special skills, as Defendant states,

"They are the Flow Measurement Specialist".

35. DANAHER with its 60+ flow measurement companies should have special skills.

**VI. SUMMARY OF "FRAUD FEATURES" DESIGNED INTO FC-100/101 ELECTRONIC WATER METER**

36. Relator alleges that the FC100/101 models currently in production after said meters are installed the following calibration parameters and totalizer value can be changed quickly any number of times **without leaving an audit trail** using a commonly known **universal password** or the factory set password.

37. Access for programming the flow parameters is done using a pair of magnets thus **leaving no fingerprints**.

**38.** In addition, if a remote monitoring computer (SCADA) is connected to said meter, it also cannot detect these parameters being changed during non-flow times.

*The following flow volume parameters can be changed any time:*

1) The Displayed Volume Total can be changed to any value

2) The Gallons per Revolution can be changed to any value

3) The Calibration Percent can be changed plus or minus 10%

4) The Cut-off Level (minimum detected flow) can be set up to eight digits

5) The totalizer and flow rate can be stopped using an external input.

6) The Pulses per Revolution can be set to 1,2,4,8,10,12,24

7) The Displayed Volume Total can be reset to zero

**39.** These "designed-in-features" are all in violation of most state water meter codes and regulations[20] which are modeled on National Institute of Standards and Technology regulations as specified in NIST Handbook 44.

**40.** All seven of these "fraud features" corrupt the factory calibration and are not legal since they can be used to commit fraud.

---

[20] Exhibit 20. Summary of State Laws and Regulations in Weights and Measures (as of August 1, 2005)

# VII.   SUMMARY OF KNOWN PRODUCT DEFECTS WITH DEFENDANT'S SAID METERS

**41.**     Listed in Table 1. are the McCrometer water meters and

their known defects in violation (10+) of the statutes listed:

**TABLE 1. DEFECTS v. VIOLATIONS**

| McCrometer Product | Design Defect | California Business and Professions Code Violation | National Institute of Standards Handbook 44, 2007 Regulations Violation |
|---|---|---|---|
| FC-100/101 Electronic Register FlowCom | Not Licensed | B&P 12500 | |
| | 1. Erratic Reading[21] | B&P 12107 | G-N.2,G-UR.1.2, G-UR.3.2 |
| | 2. Non-Responsive[22], Not Reading, Lock-up[23] | B&P 12107 B&P 17500 B&P 6580 | G.N.2, G-UR.1.2, G-UR.3.2 |
| | 3. Burnt Board calibration error | B&P 12107 | G.N.2, G-UR.1.2 |
| | 4. Display error when total > 16.78 Million gal | B&P 12107 | G-S.5.2.2(a)(b), G-T.1, G-UR.2 |
| | 5. Over-Rate rate and totalizer error PPS > 181hz | B&P 12107 B&P 17500 | G-S.2, G-S.4,G-T.1 |
| | 6. No Audit Trail – lack of proper sealing – tamper proofing | B&P 12107 | G-S.8, S.2.1 |
| | 7. Totalizer Rounding Down | B&P 12107 | G-S.2, G-S.3(a), G-T.3, T.1, T.1.1 |

[21] Exhibit 21. 9/2008 McCrometer Document FC-100/101 Defect Countermeasures/ Action Items

[22] Exhibit 22. 6/3/2008 Email to Neb Petrovacki RE: Non-Responsive Unit Problem Resolution. Latch up problem requires field service call to open unit and pull battery and replace to get unit working again.

[23] Exhibit 23. 1/25/2009 Email: and attached compliance testing failure memo from HACH, Loveland, CO  TO: Mike Stovall  RE: HACH Flocom FC-100 Testing Failure Memo Compliance Tests See p. 2 for list of compliance failures.

| | error with large totals | | |
|---|---|---|---|
| | 8. Flow Calibration Process | B&P 12107 | G-S.2, G-S.3,N.3 |
| | 9. Non-volatile Memory error | B&P 12107 | G-S.3(b), G-S.2.5, S.1.1.1 |
| | 10. Labeling | B&P 12107 | G-S.1(d) |
| | | | |
| **UltraMag™ Electromagnetic Water Meter** | 1. Totalizer Rounding Down error | B&P 12107 | G-S.2, G-S.3.(a),G-T.3, T.1, T.1.1 |
| | | | |
| **Remote Wireless Well Monitoring System RemoteCONNECT™** | 1. Labeling | B&P 12107 | G-S.1(d), |
| | 2. No Audit Trail – lack of proper sealing – tamper proofing | B&P 12107 | G-S.8, S.2.1 |
| | 3. Over-Rate rate and totalizer error | B&P 12107 B&P 17500 | G-S.2, G-S.4,G-T.1 |
| | | | |
| | | | 47 CFR 15 FCC Statutes |
| **Remote Wireless Well Monitoring System RemoteCONNECT™** | 1. FCC mandatory testing and labeling requirements | FCC part 15 | Section 15.1, 15.201, Section 2.803 47 U.S.C. 302(b), Section 2.948, Section 2.1033, Section 2.938, Section 2.1033 |

## VIII.   MISLEADING CUSTOMERS ABOUT KNOW FLOWCOM DEFECTS

**42.**    McCrometer is engaging in fraudulent business practices

by publishing intentionally misleading product specifications

and failing to notify existing customers of known product

defects.

Table 2.  McCrometer Electronic Register Specifications Summary

| Model | Year | INPUT SIGNAL RANGE | | ENVIRONMENTAL COMPLIANCE TESTING | | |
|---|---|---|---|---|---|---|
| | | Minimum | Maximum | EMI | ESD | RFI |
| | | | | | | |
| CN04-2[25] | 2002 | 0.125 hz | 3000  hz | YES | YES | YES |
| CN08-2[26] | 2007 | 0.125 hz | 3000  hz | YES | YES | YES |
| TR-32-2[27] | 2002 | 0.125 hz | 3000  hz | YES | YES | YES |
| TR29-2[28] | 2005 | 0.125 hz | 3000  hz | YES | YES | YES |
| RE100[29] | 2005 | 0.125 hz | 3000  hz | YES | YES | YES |
| RE200[30] | 2004 | 0.125 hz | 3000  hz | ? | ? | ? |
| EA401[31] | 2005 | ? | 10000 hz | ? | ? | ? |
| FC100[32] | 2006 | ? | ? | ? | ? | ? |

43.     If one compares the troubleshooting sections of

McCrometer's RE-100 and FC-100/101 electronic registers User

Manuals you notice that the RE-100 had the "Lock-up" issue

mentioned 4 times. See exhibit 47 on p. 19. Then examine

exhibit 50[24], the detailed user manual on pages 28-29. The user

manual makes no mention of "Lock-up" which misleads the

customers.

---

[24] Exhibit 50. McCrometer Document 24510-29.pdf FC100/101
[25] Exhibit 42. McCrometer Document 30116-05.pdf CN04-2
[26] Exhibit 43. McCrometer Document  30116-09.pdf CN08-2
[27] Exhibit 44. McCrometer Document  30116-27.pdf TR-32

**44.**     The **INPUT SIGNAL RANGE** specified in the FC100/101[33] user manual is not given. The specification only states:

*"INPUT COMPATIBILITY: McCrometer Flowmeters"*

The **ENVIRONMENTAL** specifications only specify temperature and moisture rating (NEMA 4X), **no EMI, ESD or RFI ratings.**

**45.**     The previous McCrometer electronic registers input ranges were explicitly stated as either 3000 hertz or 10000 hertz. Please compare the meter specifications in Table 2 above:

**46.**     Why would the Defendant hide this information? The problem is that it is typical for the larger water meters to have a higher than 181 hz PPS. A typical booster pump is specified to operate at 240 hz PPS. To see what happens when the over-range problems occurs see the graph below:

---

[28] Exhibit 45. McCrometer Document  30119-42.pdf TR-29
[29] Exhibit 46. McCrometer Document  24510-12.pdf RE200
[30] Exhibit 47. McCrometer Document  24508-86.pdf RE100
[31] Exhibit 48. McCrometer Document  24510-12.pdf EA401
[32] Exhibit 49. McCrometer Document  24510-49.pdf FC100/101
[33] Exhibit 50. McCrometer Document 24510-29.pdf FC100/01 USER MANUAL



47.     In the graph above the area of fraud occurs (the pink
area). The FC-100/101 display flashes when the GPM is above
2000.

48.     Below 2000 the display does not flash and appears normal.
If the input is increased to 205 hz the GPM reads the same as
at 102 hz. The input can be increased to 450 hz and read the
same GPM as at 150 hz.

49.     Use of VFD pumps are encouraged and subsidized by power
utility companies since they are far more power efficient.

Relator did not have time to fix this code problem and 100% of the Flowcom meters have this serious problem. Furthermore Relator noted that his supervisor, Robert Pinkerton, was responsible for commenting out the code that was suppose to **flash the display** if the input signal exceeded 181 hertz signaling the operator that a problem was happening.

50.    The 'C' Code below is from lines 130-138 in FC-100/101 source code file output.c. This code was originally designed to flash the flowmeter flow rate display when the INPUT SIGNAL range is being exceeded and cannot be measure correctly. On 9-7-2007 Robert Pinkerton commented out the code that would check for over-range of the Input Signal.

*//Commented out by RP on 9-7-07*

```
//   if(plsFreq>=180)          // if (pulseInCnt > 1) by Ye Chun
//   {
//        blinkRate |= 0x01;
//        plsFreq = 180;
//   }
     plsFreq = 0.0;
```

### IX. DEFENDANT'S REQUIRED DUTIES OF RELATOR

51.    One of Relator's specific duties was to design new electronic water meters and improve existing products, specifically the electronic water meter(s) the FC-100 and FC-101 which had been in production for at least four years.

52.    The Relator also was expected by Defendant to have significant relationships reporting to the Manager of Research and Development, Robert Pinkerton, and have internal relationships with the following: Engineering and Calibration teams, Customer Service, Manufacturing Leadership teams, and Senior Management teams.

53.    Other significant relationships included external relationships as follows: Outside testing facilities, Customers, Vendors, and Consultants.

54.    Defendant stated in McCrometer Human Resources form ESE-$2^{34}$ that Relator PERFORMANCE MEASURES were as follows:

1) Develops clear plans for assigned projects and executes on time with high level of accuracy and quality requiring minimal/no rework.

2) Demonstrates effective communications of plans and expectations to team/others. Includes appropriate people in the decision making process.

3) Identifies project problems/challenges in a timely manner. Develops and implements countermeasures for results; Involves superiors and team members as appropriate.

4) Uses education, technology and/or process improvements (DBS) to increase productivity and output quality.

---

[34] Exhibit 24. 2/11/2008 McCrometer HR Embedded Systems Engineer Job Description

## X.   RELATOR'S SEVEN MAJOR ASSIGNMENTS BY DEFENDANT DURING EMPLOYMENT

## (1) TECHNICAL LEAD ON EXISTING ELECTRONIC WATER METER FC-100/101

55.     Relator was assigned as **Technical Lead** on Defendant's FC-100/101 Flowcom Electronic Water Meter Redesign and resolved 3 of the 4 hardware design problems Defendant asked him to resolve which Relator did in the first three months.

56.     In and around October 2008 Defendant's customer, Wheeler Ridge-Maricopa Water Storage District, requested a new feature be added to the existing FC-100/101 menu of settable parameters. Relator's Manager, Robert Pinkerton, directed Relator to add a new "settable totalizer" feature allowing the customer to enter a starting total. Relator in the process of implementing the new feature discovered and resolved 3 more serious software problems[35] affecting accuracy and reliability of all FC-100/101 meters in the field, approximately 2000 units.

57.     In and around November 2008 Defendant's Flow Lab Technicians, Jose Gomez and Lucy Colon, while testing the new "settable totalizer" software found a "round-down" error in the original flow total calculations utilized to calculate the totalizer value displayed on the meter. The "round-down" error would get progressively worse as the totalizer volume

---

[35] Exhibit 25. 11/2008 McCrometer FC-100/101 Defect Countermeasures/ Action Items Document See items 1,2,8 & 9.

increased such that it would eventually "stop" totalizing (stop incrementing the totalizer) even though the flow rate would be correct. Relator verified and resolved the serious math problem in the code and the Flow Lab technicians verified the solution was correct by running the same tests.

58.     On December 15, 2008 Defendant started programming and shipping said meters with Relator's software solutions which stored total volume using integer math versus floating point math solving the round down problem Jose and Lucy found in the test lab.

59.     Defendant's Assistant Product Manager for the FC-100/101, Katie Engel, told Relator that prior to this time she had tried to get Defendant, via eleven emails, to recall all FC-100/101 and to "suspend" the product until all 4 problems could be resolved.

## (2) TECHNICAL LEAD ON NEW REMOTE AGRICULTURAL WELL MONITORING SYSTEM DESIGN

60.     Relator was assigned as **Technical Lead** on Defendant's new Remote Agricultural Well Monitoring System[36] (called RemoteCONNECT™). Relator completed design ahead of schedule

---

[36] Exhibit 26. McCrometer Document 24511-58.pdf "Central Colorado Water Conservation District Automates Water Well Flow Data With RemoteCONNECT Remote Telemetry System" p.5 "Now Central plans to work with US Senator Mark Udall, US Senator Michael Bennet and Congresswoman Betsy Markey to locate new funding sources," says Randy Ray, CCWCD Subdistrict Operations Manager.

and factory production was setup and ready to produce at the time of the constructive termination[37]. As part of this new design the Relator designed a new FlowCom (FC100/101) called the FlowCom II[38] to resolve the remaining hardware problem and used this new FlowCom II in the new RemoteCONNECT™ so as to save costs and schedule.

**61.**    This RemoteCONNECT™ system was the basis for a new business unit in Defendant's company dedicated to wireless monitoring with expected revenues of $1.5M the first year 2009.

### (3)  TECHNICAL LEAD ON NEW BATTERY POWERED ELECTROMAGNETIC WATER METER DESIGN

**62.**    Relator was assigned as **Technical Lead**[39] on Defendant's new Battery Powered Electromagnetic Water Meter for Agricultural markets. This design would be Defendant's first electromagnetic water meter product (called the 'converter-1') designed in-house. Relator completed design ahead of schedule

---

[37] Exhibit 27. McCrometer Document RemoteCOM Project Review See p.6 FCC Testing Scheduled Feb. 5, 2009

[38] Exhibit 28. CAD Rendering of EB-500 Energy Harvesting Mother Board with new Flowcom II mounted on EB-500 circuit board

[39] Exhibit 29. 7/18/2008 L & T Document MCM0781RS Converter-1 Requirement Specification See p. 6 "2.3 Stakeholders Reference, Mike Stovall, Technical Lead", Neb Petrovacki, Project Manager

and produced six completely working units for first article test phase at the time of the constructive termination.

63.     This new battery powered design was also designed to work with the new RemoteCONNECT™ system Relator designed.

**(4)  TECHNICAL SUPPORT FOR DEFENDANT'S FLOW CALIBRATION LAB TEAM**

64.     Relator was assigned to attend regular senior technical meetings with the Flow Calibration Lab team where he learned of calibration testing issues with Defendant's water meters.

**(5)  TECHNICAL SUPPORT FOR DEFENDANT'S TECHNICAL PHONE SUPPORT TEAM**

65.     Relator was assigned to provide daily technical support to the Defendant's technical phone support team.

66.     During the last few months while Relator was employed he spent a lot of time educating the technical support team, the sales people and the local distributor McCall's Meters about the round-down problem with the new "settable totalizer" when totalizer values of greater than 16.78 million gallons being entered.

67.     Relator also learned of "round-down" problems with the Defendant's "ULTRAMAG" magnetic water meter that the Defendants manufacture. Relator learned that Defendant had no design documents on the UltraMag and did not have access to any code for the UltraMag and never has had such information.

**(6) RELATOR ASSIGNED TO SUPPORT CUSTOMER PROBLEM SITES**

**68.** Relator visited numerous Defendants' customer sites to troubleshoot Defendant's electronic water meters. Specific sites where Relator went were Rancho California Water District, San Bernardino Water District, Pico Rivera Water District, Santa Margarita Water District, Lost Hills Water District, and many more.

**(7) RELATOR ASSIGNED TO SUPPORT FACTORY PRODUCTION TEAMS**

**69.** Relator was assigned to provide daily technical support to the Defendant's factory test team.

## VIII. DAMAGES

**70.** Relator would further show that treble damages for the false claims amount to tens of millions of dollars and that in excess of 2,000 of the said meters were sold and falsely certified and presented as being calibrated to government agencies.

**71.** Relator further estimates that total damages to the U.S. Government in damages and penalties are in the hundreds of million dollars.

**72.** Defendants are a "fiduciary" as such, "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries shall be held liable to make good to such plan

resulting from such breach". Furthermore, based upon the maximum statutory civil penalty of Ten Thousand Dollars ($10,000) for each false claim or statement submitted and treble damages applied to the underpayments, Relator estimates the total amount to be recovered from the Defendants to be in excess of Twenty Million Dollars ($20,000,000.00).

73.    Note that agricultural irrigation utilizes 80-85% of the water usage in the United States. Citing US Geological Survey, the American Water Works Association said that "water loss nationally at 6,000,000,000 gallons per day" for water loss from unknown causes. The San Diego County Water District which gets its imported water via EMWD and MWD states their losses at 10% for a cost of $28,000,000 per year.

## COUNT I    DEFECTIVE PRODUCT FC100/101

74.    Relator adopts and reiterates all the facts alleged in paragraphs 1 through 73, as fully and completely as if they were incorporated herein verbatim. Relator would show the following:

a) Defendants knowingly sold defective water meters to the United States via various Federal Programs which violates the Federal  False Claims Act (31 U.S.C. §§ 3729 (a)(1)(A));
b) Treble damages are called for in 31 U.S.C. §§ 3729(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 ; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

c) That the Defendants, through the acts of their officers, agents, and/or employees made false statements to the United States hiding serious design problems of said meters and their refusal to follow statutes and regulations set by the government.

d) That such statements caused direct financial impact or damage to the Treasury of the United States for said defective products paid for with funds from Federal Programs.

**COUNT II     CONSPIRACY TO DEFRAUD FRAUDULENT PRODUCT FC100/101**

75.    Relator adopts and reiterates all the facts alleged in paragraphs 1 through 74, as fully and completely as if they were incorporated herein verbatim. Relator would show the following:

a) Defendants knowingly sold fraudulent water meters to the United States via various Federal Programs which violates the Federal  False Claims Act (31 U.S.C. §§ 3729 (a)(1)(C));

b) That the Defendants knowingly designed into said meters "fraud features" that allow Defendant's clients to facilitate fraud against the government.

c) That the Defendants knew that such statements were false, and that the Relator made the Defendants aware of the falsity and illegality.

d) That such statements were intended to, and did conceal, avoid, or decrease the obligation to pay or transmit money to the Government; and

e) That such statements caused direct financial impact or damage to the Treasury of the United States for said fraudulent products paid for with funds from Federal Programs.

## COUNT III    DEFECTIVE PRODUCT RemoteCONNECT™

76.    Relator adopts and reiterates all the facts alleged in paragraphs 1 through 75, as fully and completely as if they were incorporated herein verbatim. Relator would show the following:

a) Defendants knowingly sold defective water meters to the United States via various Federal Programs which violates the Federal  False Claims Act (31 U.S.C. §§ 3729 (a)(1)(A));

b) That the Defendants, through the acts of their officers, agents, and/or employees made false statements to the United States hiding serious design problems of said RemoteCONNECT

and their refusal to follow statutes and regulations set by the government.

c) That the Defendants knew that such statements were false, and that the Relator made the Defendants aware of the falsity and illegality.

d) That such statements were intended to, and did conceal, avoid, or decrease the obligation to pay or transmit money to the Government; and

e) That such statements caused direct financial impact or damage to the Treasury of the United States for said defective products paid for with funds from Federal Programs.

**COUNT IV     CONSPIRACY TO DEFRAUD FRAUDULENT PRODUCT RemoteCONNECT™**

77.     Relator adopts and reiterates all the facts alleged in paragraphs 1 through 76 as fully and completely as if they were incorporated herein verbatim.

78.     Relator would show Defendants knowingly sold said fraudulent meters to their clients knowing that the calibration parameters set in the factory could be changed voiding said calibration and facilitate fraudulent claims in violation of 31 U.S.C. § 3729 (a)(1)(C) for conspiracy to defraud.

79.     That in performing the foregoing acts, Defendants, through the acts of their officers, agents, and/or employees, knowingly or in deliberate ignorance of the truth or the

falsity of the information, conspired to defraud the Government through the selling of a known fraudulent product to their clients that use said meters, that is, a scheme or process of false claims to the damage of the Treasury of the United States.

### COUNT V    CALIFORNIA FALSE CLAIM VIOLATIONS

**80.**    Relator adopts and reiterates all of the foregoing facts alleged in paragraphs 1 through 79 as fully and completely as if they were incorporated herein verbatim.

**81.**    Defendants violated the California False Claims Act, Cal. Gov't. Code §12653(d), by coercing Qui Tam Plaintiff to add illegal software "settable totalizer" to FC100/101 product to allow fraud.

**82.**    Relator would show that in performing the foregoing acts, Defendants violated the California False Claims Act, Cal. Govt. Code section 12650 et seq., and in particular sections 12651 (a)(7) and (8).

**83.**    These acts by Defendants have resulted in false claims and Defendants have caused damage to the Treasury of the State of California;

### COUNT VI    RETALIATION AGAINST RELATOR CHARLES M. STOVALL IN VIOLATION OF 31 U.S.C. 3730(H)

**84.**    Relator incorporates the allegations of Paragraphs 1 through 83 of this complaint, as though fully set forth

herein. During the entire time of Relator's employment with Defendant he was engaged in protected conduct as that term is defined in the False Claims Act, 31 U.S.C. §3730(h) *et seq.*

85.     This Court has jurisdiction over this claim pursuant to 31 U.S.C. § 3730(h) and 3732(a), as well as through pendent states claim jurisdiction.

86.     Relator would show that Defendants in their acts and/or practices subjected him to harassment, retaliation, discrimination and public humiliation resulting in loss of promotions and wages which actions continue to date.

87.     During his employment with McCrometer, Relator learned of the fraud perpetrated upon the Government by Defendants as herein set out. On several occasions, he requested officers and agents for Defendants to investigate, stop and report the fraud to the government. Defendants not only failed and refused, but also set about to obstruct Relator's further efforts to gather information regarding all fraudulent activities.

88.     Defendants harassed and discriminated against Relator, and undermined his credibility and personal and professional integrity and competence in violation of § 3730(h). Relator has been damaged[40] as a result of Defendant's retaliation against him for his protected activities and

---

[40] Exhibit 30. Dr. Curtis Evaluation and records p. 27 "temporarily totally" disabled"

requests this Court to grant him such relief as is appropriate under the provisions of § 3730(h).

**RELATOR'S "90 day PERFORMANCE AND FEEDBACK SUMMARY" BY DEFENDANT**

**89.** Relator knows and believes and alleges that he met Defendant's job performance requirements with 6 out of 6 performance measures graded as "Meets Expectations" dated 6/27/2008[41]. Robert Pinkerton wrote on the third Objective regarding "Results Achieved:

> "Mike has shown a passion for delivering results. He has been instrumental in defining several key FlowCom improvements and has also assisted on the Converter and RC projects."

**RELATOR'S "2008 PERFORMANCE APPRAISAL" BY DEFENDANT**

**90.** Relator knows and believes and alleges that he met Defendant's job performance requirements for 2008 with 10 out of 10 performance measures graded as "Meets Expectations" and where he stated "I like my job" on the review dated 4/28/2009[42] just a week before his constructive termination.

---

[41] Exhibit 31. 4/29/2009 McCrometer HR 6/11/2008 90-Day Performance and Development Feedback Summary

[42] Exhibit 32. 4/29/2009 McCrometer HR 2008 Performance Appraisal for MICHAEL STOVALL

**FIRST NEXUS TO CONSTRUCTIVE TERMINATION**

**91.**    In and around December 2008 Relator told Defendant's

senior management team that 100% of the Defendant's FC-100 and

FC-101 product in the field were defective and those

approximately 2000 units should be recalled, the hardware

fixed, and reprogrammed with the **corrected software especially**

**since the totalizer value "round-down" errors got worse as the**

**value in the totalizer got larger.**[43]

**92.**    Relator never again was invited to Defendant's Senior

Management meetings. Defendant's agent Robert Pinkerton

repeatedly yelled at Relator about bringing up the 100% defect

issue after that incident.

**SECOND NEXUS TO CONSTRUCTIVE TERMINATION**

**93.**    The RemoteCONNECT™ system designed by Relator was the

Defendant's first wireless remote well monitoring system via

satellite to connect a mechanical propeller water meter to an

electronic water meter allowing the mechanical and electronic

water meters to be compared on-site all the time as well as on

a password protected website.

---

[43] Exhibit 33. 11/26/2008 Email to Katie Englin RE: FloCom fixes spreadsheet.
Katie is informed that the Flowcom fixes spreadsheet has been updated.

**94.**     In and around March 2009 Defendant's agent Scott McLeod,
Program Manager for the RemoteCONNECT™, asked Relator to
change the electronic water meter software to "blank-out" the
displayed "totalizer" value so farmers using the
RemoteCONNECT™ well monitoring system, would not be able to
compare the two totalizer values at the well site.

**95.**     Relator refused to change the software as he felt this
was fraud and an opportunity to detect faulty mechanical
propeller meters as he knew occurred in McKinleyville, CA in
November 19, 2008[44].

**THIRD NEXUS TO CONSTRUCTIVE TERMINATION**

**96.**     On or around February 2009 Relator also repeated
complaint to Defendant's agent Robert Pinkerton and the design
team of six engineers in India (at EmSys, a design company in
India) about the same math errors in the new converter-1 as in
the FC-100/101.

**FOURTH NEXUS TO CONSTRUCTIVE TERMINATION**

**97.**     In and around May 1, 2009 Relator had received several
emails from Defendant's agent Robert Pinkerton requiring
Relator to shift and extend Relator's work hours without
additional pay because of problems with a vendor that supplied

---

[44] Exhibit 34. 11/19/2008 Newspaper Article Times-Standard "McKinleyville may not
have to raise water rates after all". A McCrometer meter is 24% off and
McCrometer blames a technician.

a website and satellite link used as part of the new

RemoteCONNECT™ system of 15 units being beta tested in

Building 5 at McCrometer.

**98.**     The problem was with the vendor-supplied website used to

collect well pumping data from the 15 beta units under going

testing. The website included a button to cause a "real-time"

message to selected water meters connected via radio and

satellite. Defendant wanted to have a website button to

conduct a real-time data gathering event. This "Interrogate

Button"[45] caused the vendor satellite link to crash and

required physically resetting the power to the satellite link.

See the first page from the RemoteCONNECT Website user manual

---

[45] Exhibit 35. May 4, 2009 3:34 PM Email FROM: Lenny Feuer TO: Scott McLeod RE: Overflows "The meter is where the report would normally be initiated. So we have no control over that part. It is also possible to interrogate data from the server but via satellite that would not be advisable for all those stations. We do have the ability to manually interrogate when needed but that is a very slow process via satellite."

below.



### 2.0 Home Page

The Home page can be accessed by left clicking on the "Home" button on the top navigation bar (Number 1 below). From this page the data from any one station can be read. A station's data can be accessed by selecting a site (Number 2 below) then using the drop-down menu selection to select the station (Number 3 below), or by left-clicking on a station flag on the map (Number 4 below). When a station is selected, the data from the last reporting from that station is displayed in the right window (Number 5 below). Data represented in black text is current data, red text is data older than 35 minutes and blue text is data older than 24 hours.  Select the proper time zone for accurate time reporting representation (Number 6 below).

 **IMPORTANT! DO NOT PRESS THE "INTERROGATE STATION" BUTTON.** Doing so my lock-out the station from reporting data. (See Figure 2, #6) The station will report data on a preset time interval only.

1 Navigation Bar

2 Site Select

◄── 5 Station Data

◄── 6 Time Zone Select

 ◄── **6 DO NOT PRESS!**

4 Station Select

2 Site Select
3 Station Select

Figure 2: Home Screen

1

99.    Relator repeatedly told his manager Robert Pinkerton that
it was not possible to conduct "real-time" interrogation[46] of
remote well sites using the selected satellite technology but
he refused to listen.

100.   The vendors own website stated its satellite technology
could not be used with a large number of remote units which we
were using 15 connected to one of the vendors' satellite link.

---

[46] Exhibit 36. McCrometer Document 30120-04 Rev. 1.0 RemoteCONNECT Website Manual
See p.1 (5 of 18) "IMPORTANT! DO NOT PRESS THE "INTERROGATE STATION" BUTTON.
Doing so my lock-out the station from reporting data. (See Figure 2, #6) The
station will report data on a preset time interval only"

**101.** On or around May 4, 2009 Relator contacted the vendor of the satellite link, Lenny Feuer, President of Automata, Inc. via email[47] and phone and determined their satellite link was not designed to receive signals from a website meaning it was a "one-way" data link.

**102.** Lenny's admission of their satellite crashing problem via email was emailed to Defendant's agent Robert Pinkerton. Relator told Defendant's agent Robert Pinkerton via email he should not have to work without pay since the vendor admitted it was their problem.

## FIFTH NEXUS TO CONSTRUCTIVE TERMINATION

**103.** On May 6, 2009 Relator told Robert Pinkerton about his emails with an ex-FBI white collar crime investigator and confronted him about the McKinleyville problem and the "totalizer blanking request from Scott" and the company not recalling defective products.

**104.** Defendant's agent Pinkerton then demanded that Relator go with him to register a complaint with Defendant's Human

---

[47] Exhibit 37. May 4, 2009 4:39 PM Email FROM: Scott McLeod TO: Mike Stovall RE: Any Ideas? "According to Lenny, his system should never call for data. Our systems should initiate the data transfer. I would then suspect that we should never listen for a poll, also, Lenny says that we should not use the interrogate button with satellite systems. The SATCOM was locked up again. Unit 2 is dead. It will not report out."

Resources Partner, Janene Moore. Pinkerton told Janene Moore about Relator's refusal to work overtime without pay[48].

**105.** Relator told Janene that he was required by Danaher, Inc. "Standards of Conduct" to first inform an immediate supervisor and then to a Human Resources personnel of any "reasonable suspicions" of fraudulent activities and then Danaher Integrity hotline.

**106.** Relator told the Human Resources Partner he wanted to report fraudulent activity and did so.

**107.** Relator stated he knew that Defendant's water meters were used for fiscal metering and Defendant had a fiduciary responsibility and duty to recall a product that had at least seven known serious defects, four hardware design errors, and three software design errors.

**108.** Relator informed Defendant that they were in violation of numerous State and Federal statutes.

**109.** On May 6, 2009 after meeting with Defendant's agents Robert Pinkerton and Janene Moore it was agreed that the company took Relator's claims seriously and that the problems would be addressed.

**110.** Relator was asked by Defendant's HR partner, Janene Moore, to finish working the rest of the normal work day which

---

[48] Exhibit 38.  April 25, 2009 Emails FROM: Robert Pinkerton TO: Mike Stovall RE: Remote Communications - work hours Robert states mandatory unpaid overtime is required.

he agreed but Relator's manager Robert Pinkerton insisted that Relator take off for the rest of the day. An agreement was made that the "ISSUES" brought up in the meeting would be looked into.

111. When Relator returned to work the next day at his normal time 6:00 AM, he found his office computer gone and immediately suspected the agreement from the day before had been broken and that he had been fired as it was normal and customary for Defendant to seize a fired employee's computer. Two Engineers in the past few months had the same due process.

112. Relator told four or five of his fellow employees in bldg. 1 & 5 good bye and told them he believed he had been fired in retaliation for speaking up about fraud issues the day before.

113. Relator was clearly distressed and gave his badge to the Production Shop Manager Ivan Fuentes in bldg. 5 since no Human Resources personnel were at work at the time.

114. Relator clearly told Defendant's bldg.5 Production Shop Manager Ivan Fuentes that Relator was giving him his badge since he believed he had been fired.

115. Relator told Defendant's agent Ivan Fuentes about all the fraud issues Relator raised the day before and that he thought he had a deal with HR to investigate the fraud issues brought up.

**116.** Relator went home and only then he realized he had two voicemails from Janene Moore from HR asking him not to come to work that day as McCrometer management needed time to look into the "issues"[49]. Relator obtained notarized copies of the Verizon voicemails.

**117.** Relator came back the next day to find out why he had been fired only to find that the Human Resources Manager ordered the facility's security guard to not let the Relator onto company property. The security guard called Human Resources Manager Phil Benthall who came out to the front gate and told Relator that "He had quit" which Relator denied to him. Phil Benthall stated "how dare you state that senior management is allowing fraud" and he walked away.

**118.** Relator has been damaged as a result of Defendant's retaliation against him for his protected activities and requests this Court to grant him such relief as is appropriate under the provisions of § 3730(h).

---

[49] Exhibit 11. May 6, 2009 Voicemail Transcription FROM: Janene Moore in HR TO: Mike Stovall "We are going to ask that you not come in tomorrow. We are looking into some things that were brought up today and we are going to get Phil and Melissa a chance to go over that information tomorrow so we will contact you tomorrow once they are able to communicate further in regards to the issues that were brought up today. Again we are going to ask you not come in tomorrow and if you need to contact myself or Phil please do so, but if you could give me a call back to confirm that you have received this message that would be great."

**COUNT VII.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**119.**   Relator incorporates the allegations of Paragraphs 1 through 118 of this complaint, as though fully set forth herein.

**120.**   On May 20, 2009 Relator receive a response [50] from Janene Moore to schedule a meeting to review his employee records pursuant to California Labor Code 1198.5. Janene responded and Relator went to McCrometer and met with Janene Moore and Phil Benthall on or around May 27, 2009.

**121.**   Relator told Phil and Janene that Relator had not voluntarily quit. Relator told them that Relator thought Relator had been fired since Relator's laptop had been seized May 6, 2009 and he knew it was company practice to seize computers of fired employees.

**122.**   Relator asked them how many product defects do you need and for how long before recalling the known defective products?   Relator told them Relator was instructed by Danaher Integrity Training to report fraud.

**123.**   In addition the problem in McKinleyville, CA. and the flow lab calibration process problem were addressed. During the meeting Relator also requested my employee records and evaluations.

---

[50] Exhibit 39.   May 20, 2009 McCrometer Letter to Charles Michael Stovall Re: Employer Response to Request to Review Personnel File

124.   In violation of California Labor Code 1198.5 Relator was not given his complete records. Relator was not given any performance reviews or any notes about the May 6, 2009 meeting with Janene Moore and Robert Pinkerton. Relator told Janene at the meeting, you sent Relator a letter about the meeting we had May 6, 2009 and you will not let Relator see the meeting notes? Relator stated he had a copy of his performance review and you will not let him look at the review! Relator told them that Relator had not quit and Relator said Relator thought Relator had been fired.

### MCCROMETER HR MANAGER THREATENS RELATOR

125.   In that meeting with Janene Moore, Phil Benthall asked Relator if Relator have ever seen the movie the "Insider" starring Russell Crowe. Relator said he had not and Phil told Relator the story of the movie where the tobacco scientist's life is ruined by Big Tobacco lawyers and the media. Phil said, "Mike I don't want your life ruined." Relator took that as a direct threat.

126.   Phil Benthall further told Relator that

"Even if what you say is true, you are going to be destroyed and McCrometer will just pay whatever fine and we just keep on doing business."

### McCROMETER HR HIRES LAW FIRM TO THREATEN RELATOR

127. Relator was threatened by Ann Kotlarski of Seyfarth Shaw LLP on July 6, 2009 [51] to take down information from Relator's website www.mikestovall.com about the work he had done at McCrometer. Relator removed all but one sentence about his experience at McCrometer which looks like Relator did nothing which damages Relator's future business.

128. Relator's website is used for displaying his engineering design experience and recent designs. Ann Kotlarski demanded Relator turn over his personal computers and all information regarding McCrometer.

### McCROMETER HIRES PRIVATE INVESTIGATOR TO THREATEN

129. On August 5, 2009 the Net Administrator at McCrometer, Jeff Sausman, emailed me that he had heard a rumor that McCrometer hired a private investigation firm to find any collusion between me and one of the flow calibration engineers, Rich Robinson. Rich is the other engineer who also found the calibration lab problem.

130. To quote his email [52]:

"Hey Mike,

I was dropping you a line for a few reasons. The first is that I am sorry to see the way the company treated you.

---

[51] Exhibit 40. July 6, 009 McCrometer Letter TO: Mike Stovall RE: McCrometer, Inc. Cease and Desist Demand
[52] Exhibit 41. 8/5/2009 Email from Jeff Sausman To: Mike Stovall  RE: Hi Mike its Jeff(Net admin) McCrometer

*You where obviously a master at your trade, I'm sure all will work out. Plus they had their heads too far up their asses to see how dumb they are.*

*The second is that I heard a rumor that management is hiring an investigative firm to look into Rich Robinsons system to see if you are "colluding with each other.*

*I just wanted you to know because you don't deserve this crap. I don't know why they would do this. From what I have heard they are in the wrong side of a few laws with how they are dealing with flowcom amongst other things.*

*I hope you are doing well and I hope to hear abut some of those pertly awesome projects you do. I thought you where a bad ass when 1 met you but after reading you resume I was seriously underestimating you.*

*Have a good one. Let me know if you ever want to go out for a beer."*

**131.** These invasive and threatening actions are similar to what the Tobacco Lawyers did to the whistle blowing tobacco scientist, Russell Crowe, in the movie "The Insider" that Phil Benthall, McCrometer HR Manager, threatened about.

### RemoteCONNECT PROJECT MANAGER APOLOGIZES

**132.** On May 25, 2009 Scott McLeod left a voicemail for Relator and stated:

*"I just wanted to call and see how you are doing.*

*I just wanted to talk a bit.*

*I am getting ready to wind up my career at McCrometer and I wanted to catch you before I took off.*

*I am going to give my notice tomorrow, I don't know yet.*

*Anyway, I hope things are going well for you.*

***Sorry about all the garbage that went on.***

*My number is 585-662-----. Bye bye." (Last 4 numbers Redacted)*

## PRAYER FOR RELIEF

WHEREFORE, Relator Charles M. Stovall, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendants as follows:

1. For Count I, II, III and IV treble the amount of the United States' damages, plus civil penalties of $10,000 for each false claim;

2. For all costs of this civil action, including attorneys' fees and court costs;

3. For such other and further relief as the Court deems equitable and just.

4. For double damages pursuant to U.S.S.G. § 3B1.3 where Defendants are punished for using special skills to commit fraud and in violating a special position of public trust. As Defendant states,

"They are the Flow Measurement Specialist";

MOREOVER, RELATOR Charles M. Stovall, acting on behalf and in the name of Plaintiff State California, in COUNT V, demands and prays that an award be entered in favor of the Plaintiff State California as follows:

1. For an appropriate and just multiple of the amount of the respective Plaintiff States' damages plus civil penalties for each false claim as permitted by the respective applicable law of Plaintiff States;

2. For all costs of this civil action, including attorneys' fees and court costs;

3. For such other and further relief as the Court deems equitable and just.

MOREOVER, Relator Charles M. Stovall, acting on his own behalf, demands and prays that an award be entered in his favor as follows:

1. That Relator on Counts I, II, III and IV as Qui Tam Plaintiff in the actions on behalf of Plaintiff United States be awarded the maximum amount allowed for Relator pursuant to the

respective laws of the United States with respect to False Claims as herein cited and any other applicable provisions of law;

2. That Relator on Count V, as Qui Tam Plaintiff in the actions on behalf of Plaintiff State be awarded the maximum amount allowed for Relator pursuant to the respective laws of the Plaintiff States with respect to False Claims Violations as herein cited and any other applicable provisions of law; for an amount for reasonable expenses incurred by the Relator in the prosecution of this action; and for all reasonable attorney's fees and costs incurred by the Relator;

3. That Relator in Count VI be awarded the maximum amount allowed pursuant to § 3730(h) of the False Claims Act. Relief shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, Two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, an amount for reasonable expenses incurred by the Relator in the prosecution of this action;

4. That Relator on Count VII such special damages as to which the Relator may show him self justly entitled and as a deterrent to others.

1

### DEMAND FOR JURY TRIAL

2  Plaintiff/Relator Charles M. Stovall demands that this case be

3  tried before a jury.

4                                              Dated: April *13*, 2011

5

6

7  _Charles Michael Stovall_

8                                        CHARLES MICHAEL STOVALL

9                                           Plaintiff, In Pro Se

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

The undersigned certifies that on this _13_ day of APRIL, 2011, a copy of the foregoing Original Complaint was placed United States Mail, first class mail, postage prepaid, and addressed to:

Honorable Eric Holder
Attorney General of the United States
950 Pennsylvania Ave. NW, Room 4545
Washington, D.C. 20530-001

Andre Birotte Jr., Esq.
United States Attorney for the Central District
U.S. Attorney's Office
Central District of California
Suite 1200
312 N. Spring Street
Los Angeles, CA 90012

Leon Weidman, Esq.
Assistant United States Attorney
The United States Attorney's Office
Central District of California
Civil Division
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012

James J. Fletcher, Superintendent
United States of America
Department of the Interior
Bureau of Indian Affairs
1451 Research Park Drive, Suite 100
Riverside, California 92507-2154

Attorney General of California Kamala D. Harris
The Attorney General's Office
California Department of Justice
Attn: False Claims Unit
P.O. Box 944255
Sacramento, CA 94244-2550